1  BILAL A. ESSAYLI
   Acting United States Attorney
2  CHRISTINA T. SHAY
   Assistant United States Attorney
3  Chief, Criminal Division
   PETER DAHLQUIST
4  Assistant United States Attorney
   Chief, Riverside Office
5  CORY L. BURLESON (Cal. Bar No. 322239)
   Assistant United States Attorney
6  Deputy Chief, Riverside Office
        3403 Tenth Street, Suite 200
7       Riverside, California 92501
        Telephone: (951) 276-6945
8       Facsimile: (951) 276-6202
        Email:    Cory.Burleson@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                  UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14 UNITED STATES OF AMERICA,          No. 5:25-mj-500-DUTY

15           Plaintiff,               PRELIMINARY HEARING BRIEF

16              v.                    Date: August 15, 2025
                                      Time: 4:30 p.m.
17 JOSE DE JESUS ORTEGA and           Court: Hon. Shashi H. Kewalramani
   DANIELLE NADINE DAVILA,
18
             Defendants.
19

20

21      Plaintiff United States of America, by and through its counsel

22 of record, the Acting United States Attorney for the Central District

23 of California and Assistant United States Attorney Cory L. Burleson,

24 submits this brief to assist the Court in conducting the anticipated

25 preliminary hearing in this matter.  The brief provides an overview

26 ///

27 ///

28

1  of the anticipated evidence at the preliminary hearing, case law

2  governing preliminary hearings, the probable cause standard,

3  evidentiary matters, and disclosures.

4   Dated: August 14, 2025              Respectfully submitted,

5                                       BILAL A. ESSAYLI
                                        Acting United States Attorney
6
                                        CHRISTINA T. SHAY
7                                       Assistant United States Attorney
                                        Chief, Criminal Division
8
                                        PETER DAHLQUIST
9                                       Assistant United States Attorney
                                        Chief, Riverside Office
10

11

12                                      _____
                                        CORY L. BURLESON
13                                      Assistant United States Attorney

14                                      Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3      On July 24, 2025, defendant Jose de Jesus Ortega ("Ortega") and

4 Danielle Nadine Davila ("Davila") (collectively, "defendants") were

5 charged by criminal complaint with forcibly assaulting, impeding, and

6 interfering with a federal officer involving physical contact, in

7 violation of 18 U.S.C. § 111(a)(1), and conspiring to prevent, by

8 force and intimidation, a federal officer from discharging his

9 duties, in violation of 18 U.S.C. § 372.  The offenses arise from an

10 incident in which an Immigration and Customs Enforcement ("ICE")

11 Enforcement and Removal Operations ("ERO") followed a fleeing suspect

12 into the Ontario Advanced Surgery Center (the "Surgery Center").

13 While the ERO officer was attempting to detain the fleeing suspect,

14 defendants assaulted, impeded, and interfered with the officer.

15 Defendants were arrested and made their initial appearances on July

16 25, 2025.  On August 14, 2025, the Court dismissed the § 372 count on

17 motion by the government.  (ECF 27.)  On August 15, 2025, the Court

18 is scheduled to hold a preliminary hearing to determine if the

19 § 111(a)(1) charge is supported by probable cause.

20 **II.  THE PURPOSE OF A PRELIMINARY HEARING IS TO DETERMINE WHETHER**

21      **THERE IS PROBABLE CAUSE**

22      At a preliminary hearing, the court's sole task is to determine

23 whether there is "probable cause to believe an offense has been

24 committed and the defendant committed it."  Fed. R. Crim. P. 5.1(e).

25 In other words, "the purpose of a preliminary hearing . . . is to

26 require the government to show probable cause to hold a suspect

27 pending trial."  <u>Hooker v. Klein</u>, 573 F.2d 1360, 1367 n.7 (9th Cir.

28 1978).  Courts routinely apply this same probable cause standard when

reviewing complaints and search warrants.  Probable cause requires "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007); see also Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. Cir. 1973) ("Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."); United States v. Bishop, 264 F.3d 919, 924 (9th Cir. 2001) ("Probable cause exists when there is a fair probability or substantial chance of criminal activity.").  "[C]onclusive evidence of guilt is of course not necessary . . . to establish probable cause," Lopez, 482 F.3d at 1072, which means "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the probable-cause decision. . . .  All we have required is the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (citations omitted).

In evaluating probable cause, courts consider the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Under this standard, courts must consider "the whole picture" rather than viewing individual facts "in isolation." District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018).  Accordingly, "[i]t is not uncommon for seemingly innocent conduct to provide the basis for probable cause." United States v. Rodriguez, 869 F.2d 479, 483 (9th Cir. 1989); see also United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995) ("[O]bservations of conduct consistent with drug

trafficking, even though apparently innocuous, can give rise to probable cause."). A magistrate judge presiding over a preliminary hearing can "legitimately find probable cause while personally entertaining some reservations." Coleman, 477 F.2d at 1202.

Inquiries about potential affirmative defenses are not relevant to the probable cause determination. Broam v. Bogan, 320 F.3d 1023, 1023 (9th Cir. 2003) (once probable cause established, an officer need not investigate further to look for evidence that may exculpate accused "whether the claim is based on mistaken identity or a defense such as lack of requisite intent" (quoting Baker v. McCollan, 443 U.S. 137, 145-56 (1979))). An affirmative defense to a crime "does not negate the commission of the crime charged or the existence of any element thereof. It is an excuse [or justification] for a crime, not a denial of one." Labensky v. County of Nassau, 6 F. Supp. 2d 161, 177 (E.D.N.Y. 1998), aff'd sub nom Labensky v. Rozzi, 173 F.3d 845 (2d Cir. 1999). Thus, evidence relating to an affirmative defense is irrelevant at a preliminary hearing, the sole purpose of which is to determine whether there is probable cause to believe that defendant committed a crime. See United States v. Pack, 255 F. Supp. 3d 695, 699-700 (S.D. Tex. 2017) (quoting Labensky in finding probable cause following a preliminary hearing, stating that the defendant was "mistaken as to the relationship between [an affirmative defense] and probable cause" and that "the probable cause arising from [defendant's] actions remains unaffected by the subsequent [assertion] of" an affirmative defense).

Nor does the probable cause inquiry permit courts to question the thoroughness of an investigation that might have provided more than the minimal "fair probability" threshold -- even where further

investigation may uncover "potentially dispositive" evidence.  United States v. Goude, 440 F.3d 1065, 1073 & n.5 (9th Cir. 2005) (en banc) ("the benchmark is not what the FBI 'could have' done" (citing United States v. Miller, 753 F.2d 1475, 1481 (9th Cir. 1985) (probable cause exists even though officers failed to take "simple steps" which could have independently verified facts))).  Once probable cause is established, there is simply no requirement that officers "continue to investigate or seek further corroboration."  Ewing v. City of Stockton, 588 F.3d 1218, 1227 (9th Cir. 2009).

## III.  EVIDENTIARY MATTERS

### A.    The Federal Rules of Evidence do not apply.

The Federal Rules of Evidence "do not apply to . . . a preliminary examination in a criminal case."  Fed. R. Evid. 1101(d)(3).  The only exception is that the rules on privilege still apply.  Fed. R. Evid. 1101(c).  As described below, the evidence that may be presented at preliminary hearings differs in important respects from the typical rules of evidence.

### B.    Hearsay is admissible.

Because the normal rules of evidence do not apply, hearsay is admissible at preliminary hearings.  See, e.g., Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) ("In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial.  Indeed, at a preliminary hearing in federal court a finding of probable cause may be based upon hearsay in whole or in part.") (internal quotation marks omitted); Peterson v. California, 604 F.3d 1166, 1171 n.4 (9th Cir. 2010) (the Fourth Amendment permits a determination of probable cause at a preliminary hearing based on hearsay testimony).  This concept has deep roots.

1  Rule 5.1, the rule governing preliminary hearings, previously

2  contained an explicit statement that "[t]he finding of probable cause

3  may be based upon hearsay evidence in whole or in part."  The

4  Advisory Committee omitted that language in the 2002 amendments,

5  deeming it unnecessary because federal law had become clear that it

6  is appropriate to rely on hearsay at the preliminary hearing and the

7  Federal Rules of Evidence explicitly state that they do not apply at

8  this stage.  Fed. R. Crim. P. 5.1 Advisory Committee Notes on 2002

9  Amendments; Fed. R. Evid. 1101.  Presentation of hearsay at a

10  preliminary hearing also poses no Confrontation Clause problem

11  because the Confrontation Clause is a trial right.  Peterson, 604

12  F.3d at 1169-70.

13        C.    Suppression arguments are premature.

14        At a preliminary hearing, the defendant "may not object to

15  evidence on the ground that it was unlawfully acquired."  Fed. R.

16  Crim. P. 5.1(e).  Thus, a defendant may not raise arguments that

17  evidence should be suppressed.  See, e.g., Giordenello v. United

18  States, 357 U.S. 480, 484 (1958); United States v. Olender, No. 00-

19  CR-80141-DT, 2000 WL 977295, at *3 (E.D. Mich. May 26, 2000).

20        D.    Cross-examination is limited.

21        Because the only purpose of the preliminary hearing is to

22  determine probable cause, the scope of cross-examination of

23  government witnesses is limited.  "Cross-examination at a preliminary

24  hearing, like the hearing itself, is confined by the principle that a

25  probe into probable cause is the end and aim of the proceeding[.]"

26  Coleman, 477 F.2d at 1201.  Defense counsel may not use cross-

27  examination to go "on an impermissible quest for discovery."  Id.

28  For example, the Fifth Circuit upheld a magistrate judge's decision

1   to prevent cross-examination about the identity of an informant.

2   United States v. Hart, 526 F.2d 344, 344 (5th Cir. 1976).

3      Likewise, cross-examination questions directed to potential

4   suppression arguments would be outside the scope of the preliminary

5   hearing.  In addition to the special limitations for preliminary

6   hearings, "cross-examination is properly to be limited at preliminary

7   hearing, as at trial, to the scope of the witness'[s] direct

8   examination."  Coleman, 477 F.2d at 1201.

9      E.   Defense subpoenas are limited.

10      The defendant is entitled to subpoena witnesses "whose testimony

11  promises appreciable assistance on the issue of probable cause,"

12  unless there is "good cause for not requiring [the witness's]

13  presence."  Id. at 1205.  Good cause for not requiring a witness's

14  presence may include "physiological or psychological reasons" that

15  make appearance unreasonable.  United States v. King, 482 F.2d 768,

16  773 (D.C. Cir. 1973).  Subpoenas must comply with Rule 17, including

17  the requirement that the defense obtain a court order for any

18  subpoena requiring production of personal or confidential information

19  about a victim and that the court give the victim an opportunity to

20  move to quash the subpoena.  Fed. R. Crim. P. 17.  Subpoenas may not

21  seek privileged information.  See Fed. R. Evid. 1101(c), (d) (stating

22  that rules on privilege apply to preliminary examinations in criminal

23  cases).  Subpoenas are not "a means of discovery for criminal cases,"

24  and, as always, they must be limited to relevant, admissible, and

25  specific information.  United States v. Nixon, 418 U.S. 683, 698-99

26  (1974); see also United States v. Komisaruk, 885 F.2d 490, 494-95

27  (9th Cir. 1989) (courts may quash subpoenas if the information sought

28  would be immaterial, unreasonable, oppressive, or irrelevant).

## IV.   WITNESS AND EXHIBITS

The United States plans to call one witness at the preliminary hearing, the case agent, Special Agent Fahd Farouh with Homeland Security Investigations ("HSI").  For the hearing, the United States hereby submits SA Farouh's affidavit in support of the criminal complaint in this case, attached as Exhibit 1.  The United States anticipates that SA Farouh will affirm that the facts in his affidavit are correct, and the United States plans to supplement those facts with video evidence and additional testimony from SA Farouh regarding the incident discussed in Exhibit 1.

## V.   DISCLOSURES REQUIRED INCIDENT TO PRELIMINARY HEARINGS

Disclosure is a natural, but collateral, effect of any preliminary hearing.  A preliminary hearing "does not include discovery for the sake of discovery."  Coleman, 477 F.2d at 1199-200; see also Robbins v. United States, 476 F.2d 26, 32 (10th Cir. 1973) ("[A] preliminary hearing is not designed for the purpose of affording discovery for an accused."); United States v. Begaye, 236 F.R.D. 448, 454 (D. Ariz. 2006) ("[T]he rules of discovery found in Rule 16, Federal Rules of Criminal Procedure, are not applicable to preliminary hearings.").  Rather, Rule 5.1 directs the parties to make certain limited disclosures.  Specifically, the parties are required to produce the statements of the witnesses whom they call to testify at the preliminary hearing.  Fed. R. Crim. P. 5.1(h), 26.2.

Statements must be produced only if they "relate[] to the subject matter of the witness's testimony" and also fall into one of the following categories:

> (1) a written statement that the witness makes
> and signs, or otherwise adopts or approves;

         (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or

         (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed. R. Crim. P. 26.2(f).  As to the first category, a report or notes on a witness interview cannot be adopted by the witness unless the witness read them or heard them read back.  Goldberg v. United States, 425 U.S. 94, 110 n.19 (1976); United States v. Traylor, 656 F.2d 1326, 1336 (9th Cir. 1981).  As to the second category, records only qualify if they "reflect the witness'[s] own words" and constitute a "complete recital."  United States v. Bobadilla-Lopez, 954 F.2d 519, 522 (9th Cir. 1992).  Thus, Rule 26.2 generally does not require disclosure of interview reports unless the report author is a testifying witness and testifies about the interview.  See United States v. Moore, 651 F.3d 30, 75 (D.C. Cir. 2011).  If material does qualify as witness statements, it must be turned over "[a]fter a witness . . . has testified on direct examination."  Fed. R. Crim. P. 26.2(a); see United States v. Mills, 641 F.2d 785, 789-90 (9th Cir. 1981) (holding that "no statement of a government witness is discoverable until the witness has testified on direct examination").

## VI.   CONCLUSION

The foregoing provides an overview of legal issues relating to preliminary hearings and the anticipated evidence at the preliminary hearing in this case.  Should any issue arise that has not been covered in this brief, the government respectfully requests leave to submit such further memoranda as may be necessary.

EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT

07/24/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

07/24/25

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

UNITED STATES OF AMERICA,

v.

JOSE DE JESUS ORTEGA, and
DANIELLE NADINE DAVILA,

        Defendants.

Case No.    5:25-mj-00500

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On July 8, 2025, in the County of San Bernardino, within the Central District of California, defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 111(a)(1) & 372 | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

HSI Special Agent, Fahd Farouh
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     July 24, 2025

_____
*Judge's signature*

City and state:   Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Cory L. Burleson

## AFFIDAVIT

I, Fahd Farouh, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal
complaint against, and arrest warrants for, Jose De Jesus Ortega
("ORTEGA") and Danielle Nadine Davila ("DAVILA") for a violation
of 18 U.S.C. § 111(a)(1), forcibly assaulting, impeding, and
interfering with a federal officer involving physical contact;
and a violation of 18 U.S.C. § 372, conspiring to prevent, by
force and intimidation, a federal officer from discharging his
duties.

2.    The facts set forth in this affidavit are based on my
personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
arrest warrants and does not purport to set forth all my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### II. AFFIANT BACKGROUND

3.    I am a Special Agent with Homeland Security
Investigations ("HSI") and have been employed as a Special Agent
since March 2023.  I am currently assigned to the HSI Assistant
Special Agent in Charge Office in Riverside, California.

4.    I am a graduate of the Federal Law Enforcement
Training Center and have received extensive training in the
investigation of narcotics trafficking, financial crimes,
violent offenses, and other violations of federal law.  I have
participated in hundreds of investigations involving Title 18
and Title 21 offenses.  I am also cross designated to enforce
federal narcotics laws and have collaborated with several
federal law enforcement agencies, various state and local
agencies.

5.    Throughout my career, I have arrested numerous
individuals for criminal offenses, conducted numerous interviews
with witnesses, defendants, prosecutors, and participated in
both covert and overt surveillance.  I am familiar with the
tactics used by defendants and criminal organizations to smuggle
narcotics, evade detection, assault law enforcement officers,
and obstruct investigations.

### III.  STATEMENT OF PROBABLE CAUSE

6.    Unless otherwise indicated, I know the following based
on my review of law enforcement reports, conversations with
other law enforcement agents, my review of publicly available
video recordings, and my own knowledge of the investigation:

**A.    Illegal Alien Flees from ERO Officers and Runs into
Surgery Center**

7.    On July 8, 2025, two Immigration and Customs
Enforcement ("ICE") Enforcement and Removal Operations ("ERO")
officers (hereinafter, "Officer One" and "Officer Two") were
conducting roving immigration-related operations as part of

2

their official duties in Ontario, California.  Officer One and
Officer Two were wearing government-issued equipment, including
marked law enforcement vests.  Officer One and Officer Two were
in an unmarked government-operated vehicle.

8.    A little before 10:00 a.m., Officer One and Officer
Two were following a truck with three adult males when they saw
the truck make a quick turn into the parking lot of the SCA
Health Ontario Advanced Surgery Center (the "Surgery Center"),
located at 1211 West 6th Street, Ontario, California 91762.

9.    The three adult males exited the truck, and one of
them began urinating on the exterior wall of the Surgery Center.
At that time, Officer One and Officer Two decided to conduct a
consensual encounter with the three adult males.

10.    As soon as Officer One and Officer Two exited their
vehicle, the two non-urinating males fled the area on foot in
opposite directions.  According to Officer One, one of the
fleeing males, later identified as an illegal alien (the "Target
Alien"),[1] ran towards the entrance of the Surgery Center.
Officer One followed the Target Alien, while Officer Two stayed
with the adult male who did not flee.

11.    According to Officer One, following a foot pursuit,
Officer One partially detained the Target Alien near the front
entrance of the Surgery Center.  The Target Alien resisted and
pulled away from Officer One, and both Officer One and the
Target Alien fell on the ground near the Surgery Center's

_____

[1] The Target Alien's identity is known to law enforcement.
According to the Target Alien's A-File, the Target Alien is a
Honduran national without permission to be in the United States.

3

entrance.  Shortly thereafter, an individual dressed in medical staff attire helped the Target Alien off the ground and assisted in pulling the Target Alien away from Officer One.

12.  According to Officer One, the Target Alien proceeded inside the Surgery Center towards a door that Officer One believed led into a private area of the Surgery Center.  Officer One followed and stopped the Target Alien near that door.

**B.    ORTEGA and DAVILA Assault, Impede, and Interfere with Officer One**

13.  On July 11, 2025, and the days that followed, I reviewed publicly available video recordings of Officer One's encounter with the Target Alien and various staff members inside the Surgery Center.  One of the video clips I reviewed was posted on YouTube by the New York Post, and it appears that the footage was captured by one or more individuals inside the Surgery Center using one or more cell phones.[2]  Based on my review of this video footage, I know the following:

a.    Officer One was wearing a vest with "ICE" and "POLICE" markings that were clearly visible.

b.    Officer One was near a doorway inside the Surgery Center attempting to detain the Target Alien.  Throughout the clip, multiple individuals--who appeared to work at the clinic based on their attire and/or the statements they made in the video--surrounded Officer One.

---

[2] The video footage is available at https://www.youtube.com/watch?v=9PW6Bysinn0 (last accessed on July 23, 2025).

c.    One of those individuals was a male, who was
later identified (as described below) as ORTEGA.  In the video,
it appears that ORTEGA was wearing navy blue medical scrubs,
white Croc-style sandals, a light blue surgical cap with the
letters "LA" on the front of it,[3] and a black watch on his left
wrist.

d.    Another individual in the video was a female, who
was later identified (as described below) as DAVILA.  In the
video, it appears that DAVILA was wearing navy blue medical
scrubs with light blue Croc-style sandals.  DAVILA was also
wearing glasses and appears to have reddish-brown hair.

e.    At one point in the video, Officer One was facing
the Target Alien with ORTEGA and DAVILA to Officer One's left.
DAVILA, along with other staff members, told Officer One to
leave.  A few moments later, while Officer One had a grasp on
the Target Alien, DAVILA told Officer One, "Get your hands off
of him."  DAVILA then lowered herself under Officer One's
outstretched arm and wedged herself between Officer One and the
Target Alien.  Officer One then attempted to pull the Target
Alien towards him, but Officer One was unable to do so because
DAVILA had positioned herself between Officer One and the Target
Alien.

_____

[3] The "LA" letters are not clearly visible in the video clip
posted by the New York Post, but the letters are more visible in
another video clip of the incident posted on YouTube by KTLA.
That video footage is available at
https://www.youtube.com/watch?v=7Yhox15fvDw (last accessed on
July 23, 2025).

f.    Immediately thereafter, ORTEGA, who was still
standing to Officer One's left, appeared to grab Officer One's
arm and then his vest, causing Officer One to turn toward
ORTEGA.  Officer One responded, telling ORTEGA not to touch him.

g.    Seconds later, it appears that Officer One was
trying to regain his grasp on the Target Alien.  However, DAVILA
was still standing between Officer One and the Target Alien,
preventing Officer One from maintaining his grasp of the Target
Alien and preventing Officer One from detaining the Target
Alien.  DAVILA started shouting in Officer One's face, "let him
go" and "get out."  Officer One responded by telling DAVILA that
she "touched a federal agent."  Meanwhile, ORTEGA appears to
maintain one hand on Officer One, with the other hand pointing
in the opposite direction while directing Officer One to leave.

h.    Officer One attempted to reach around DAVILA, who
was still wedged between Officer One and the Target Alien.
DAVILA then appears to push Officer One with her body while
holding onto the door handle with her left hand and using her
right hand to brace herself against the doorway for leverage.
In doing so, DAVILA further prevented Officer One from detaining
the Target Alien.  ORTEGA then grabbed Officer One's left arm in
an apparent attempt to move Officer One away from the Target
Alien and DAVILA.

C.   **Officer One and Officer Two Eventually Detain the
     Target Alien**

14.  According to Officer One, at one point, Officer One
called Officer Two and requested assistance in detaining the

Target Alien.  According to Officer Two, during that phone call,
Officer One told Officer Two that he was inside the Surgery
Center with the Target Alien, and Officer One said, "they're
grabbing me."

15.  Officer Two eventually entered the Surgery Center
after Surgery Center staff members initially locked him out.
According to Officer Two, when he entered the Surgery Center, he
saw multiple staff members grabbing Officer One while Officer
One was attempting to detain the Target Alien.  Officer Two also
reported that he saw a female staff member had wedged herself
between Officer One and the Target Alien, which impeded Officer
One's ability to detain the Target Alien.

16.  According to the officers, Officer One and Officer Two
eventually detained the Target Alien in handcuffs and exited the
Surgery Center.

### D.  ORTEGA Identified

17.  On July 16, 17, and 18, 2025, HSI Special Agents
conducted surveillance outside the Surgery Center to identify
ORTEGA and DAVILA.

18.  On July 16, 2025, HSI Special Agents saw a black
Volkswagen hatchback parked amongst other vehicles on the west
side of the Surgery Center, which agents believe is the employee
parking area because it is surrounded by a fence.  The hatchback
had a California license plate number ending in xxxx743.

19.  According to California Department of Motor Vehicle
("DMV") records, the hatchback is registered to ORTEGA at an
address in Highland, California.  The DMV photo for ORTEGA is

shown below on the left, and the male in the photo closely
resembles the male that assaulted Officer One on July 8, 2025,
as shown in the New York Post video discussed above.

 

    20.  On July 17, 2025, at approximately 5:48 a.m., HSI
Special Agents saw the black hatchback enter the Surgery Center
parking lot and drive to the employee parking area.  Agents saw
a tall, Hispanic male--who resembled ORTEGA's DMV photo wearing
a blue baseball hat with the Los Angeles Dodgers "LA" logo--exit
the hatchback and enter the Surgery Center's rear entrance.
About thirty minutes later, agents saw the same male outside the
facility in the employee parking area talking to another
individual.  This time, the male that resembled ORTEGA was
wearing navy blue scrubs and a light blue surgical cap that had
"LA" in white letters on the front of it.  The light blue
surgical cap appears to be the same surgical cap worn by the
male who assaulted Officer One on July 8, 2025 (as shown in the
screenshot below).



21.  On July 18, 2025, HSI Special Agents again saw the hatchback park in the Surgery Center's employee parking area.  A male who resembled ORTEGA--wearing dark blue scrubs, a black watch on his left wrist, and a light blue surgical cap with "LA" letters on the front--exited the hatchback and walked towards the Surgery Center's rear entrance.  A Special Agent also saw what appeared to be a tattoo or physical marking on ORTEGA's right forearm.  Photos of ORTEGA in the employee parking area are included below:





22.  HSI searched for ORTEGA in law enforcement databases. One of the databases included photos of tattoos that ORTEGA has on his right forearm (shown below on the left).  The tattoos are consistent with the male resembling ORTEGA in the New York Post video discussed above (screenshots from which are the two photos on the right below).

  

23.  For these reasons, I believe that the male who assaulted Officer One on July 8, 2025, is ORTEGA.

**E.    DAVILA Identified**

24.  On July 20, 2025, HSI Special Agents conducted open-source and law enforcement queries.  In doing so, Special Agents found a publicly available list of employees for the Surgery Center.  The list of employees included DAVILA, who is listed as a Certified Surgical Technologist.

25.  Using California DMV records, agents identified DAVILA's registered address in Corona, California, and a copy of DAVILA's DMV photo.  The female in the DMV photo closely resembles the female that assaulted Officer One on July 8, 2025, as shown in the New York Post video discussed above.

 

26.  On July 22, 2025, HSI Special Agents conducted
surveillance at the address on DAVILA's driver's license.
Parked outside the address, agents saw a white Hyundai Sonata
bearing a California license plate number ending in xxxx244,
registered to DAVILA at the address.

27.  According to Special Agents on surveillance, at
approximately 7:52 a.m., a female adult closely resembling
DAVILA and a juvenile male exited the residence at the address
and entered the Sonata.  The female was dressed in navy blue
scrubs and light blue Croc-style sandals.  Photos of the female
outside the residence are included below:

11

 

28.   Special Agents followed the Sonata from the residence
to the Surgery Center, where other agents and law enforcement
officers were staged.   Law enforcement saw the Sonata park in
the Surgery Center's employee parking area, and then they saw
DAVILA and the juvenile walk towards the Surgery Center's rear
entrance.

29.   Based on their surveillance, agents believe DAVILA
closely resembled the female in the New York Post and KTLA
videos discussed above because DAVILA has faded, red dye in her
hair, DAVILA's hair was tied up in a loose bun, and she was
wearing glasses, navy blue scrubs, and light blue Croc-style
sandals.   As shown in the screenshots below from the New York
Post video, these features and descriptions are consistent with
the female who assaulted Officer One on July 8, 2025:

 

30.  For these reasons, I believe that the female who
assaulted Officer One on July 8, 2025, is DAVILA.

### IV. **CONCLUSION**

31.  For all the reasons described above, there is probable
cause to believe that ORTEGA and DAVILA each committed a
violation of 18 U.S.C. § 111(a)(1), forcibly assaulting,
impeding, and interfering with a federal officer involving
physical contact; and a violation of 18 U.S.C. § 372, conspiring
to prevent, by force and intimidation, a federal officer from
discharging his duties.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of
July, 2025.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE